**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| HELEN OGLETREE, | ) | CASE NO. 1:16CV0031 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
|     Acting Commissioner | ) | |
|     of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Helen Ogletree ("Plaintiff" or "Ogletree"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. §1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons

set forth below, the Magistrate Judge recommends the Commissioner's final decision be

VACATED and the case REMANDED for further proceedings consistent with this Opinion.

## I.  PROCEDURAL HISTORY

In September 2012, Ogletree filed an application for SSI, alleging a disability onset date

of September 2011 and claiming she was disabled due to schizophrenia and severe mental illness.[1]  (Transcript ("Tr.") 242, 424.)  The applications were denied initially and upon reconsideration, and Ogletree requested a hearing before an administrative law judge ("ALJ").  (Tr. 242, 333-335, 344-345, 349-350.)

On June 5, 2014, an ALJ held a hearing, during which Ogletree, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 259-283.)  On June 27, 2014, the ALJ issued a written decision finding Ogletree was not disabled.  (Tr. 242-252.)  The ALJ' s decision became final on November 18, 2015, when the Appeals Council declined further review.  (Tr. 1-6.)

On January 7, 2016, Ogletree filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17.)  Ogletree asserts the following assignments of error:

(1)　　The ALJ violated the treating physician rule, resulting in a finding of residual functional capacity that is not supported by substantial evidence.

(2)　　The ALJ erred by failing to assess whether Ms. Ogletree met, or medically equaled Listing 12.03.

(3)　　The ALJ's decision erred as it misapplied the *Drummond* holding, wrongly concluding that Plaintiff's medical condition had not materially worsened since her last hearing denial.

---

[1] As discussed *infra*, Ogletree filed a prior application for SSI in November 2008, alleging a disability onset date on November 24, 1982 due to asthma, hepatitis C, antisocial personality disorder, dysthymic disorder, borderline intellectual functioning, and substance addiction disorder.  (Tr. 287-295.)  Her application was denied initially and upon reconsideration, and a hearing was conducted on February 7, 2011.  (Tr. 287.)  On August 17, 2011, the ALJ in that case issued a written decision finding Ogletree was not disabled.  (Tr. 287-295.)  The Appeals Council upheld the decision in August 2012.  (Tr. 301.) It does not appear Ogletree pursued a further appeal.

(Doc. No. 15.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Ogletree was born in July 1967 and was forty-six (46) years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 412.)  *See* 20 C.F.R. §416.963(c).  She has an eighth grade education and is able to communicate in English.  (Tr. 251)  She has no past relevant work.  (*Id.*)

### B.   Relevant Medical Evidence

The record reflects Ogletree was incarcerated from 2009 to July 2012 and received mental health treatment during this time period.  (Tr. 471-479, 488, 520.)  In November 2011, Ogletree indicated she was depressed but refused medication.  (Tr. 477.)  She was alert and oriented, maintained good eye contact, had clear speech, and denied hearing voices.  (*Id.*)  In February 2012, Ogletree reported "increase in depression and hearing voices at times," but again stated she did not want to "go back on meds at this time."  (*Id.*)  She was examined by a registered nurse, who noted Ogletree "appears stable- no acute symptoms."  (*Id.*)  Rebecca Schlachet, Ph.D., diagnosed Ogletree with schizoaffective disorder, alcohol and cocaine dependence, and antisocial personality disorder; and assessed a Global Assessment of Functioning ("GAF") of 40 to 50.[2]  (Tr. 471.)

_____

[2]The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A recent update of the DSM eliminated the GAF

3

In April 2012, Ogletree sought a referral for mental health services upon her release from prison. (Tr. 471-479.) She reported she had been off her medications for the previous six to seven months because of side effects, including dry mouth, "jittery" and weight gain. (Tr. 472.) She felt "depressed, crying, still paranoid, still violent, I just try to sleep now and isolate myself I don't want to be bothered." (*Id*.) She reported suicidal feelings, but stated she was not going to act on them.[3] (*Id*.) Ogletree also stated she "feels she is always being watched and followed and when she tells people she sees things they tell her she is not seeing it." (*Id*.) She requested a referral for mental health counseling and medication. (Tr. 479.)

In July 2012, Ogletree met with social worker Vanilda Reyes de Noves, MSW, LISW, and sought assistance with recovery, social services, and mental health treatment. (Tr. 487-489.) Ogletree reported paranoia, auditory and visual hallucinations, and symptoms of a mood disorder including depressed mood, crying spells, irritability, mood swings, trouble concentrating, memory problems, and low self-esteem. (Tr. 487.) She stated she had been prescribed various psychiatric medications in the past but stopped taking them due to side effects, although she did note Thorazine and Seroquel helped reduce her symptoms. (*Id.*)

Ms. Reyes de Noves noted diagnoses of schizoaffective disorder, alcohol and cocaine dependence, and antisocial personality disorder; and assessed a GAF of 32 indicating major impairment. (Tr. 489.) She referred Ogletree for psychiatric, pharmacological, and Community

---

scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

[3] Ogletree reported a previous suicide attempt in 2009, where she "banged her head on the concrete wall outside and on the ground." (Tr. 475.) She stated she was admitted to St. Vincent Charity Hospital and held there for three days. (*Id*.)

Psychiatric Supportive Treatment ("CPST") services.  (*Id.*)

On August 9, 2012, Ogletree presented for CPST services with Carrianne Mahoney, Qualified Mental Health Specialist ("QMHS").  (Tr. 526.)  Ogletree stated she had been out of her medications "for a long time" and was feeling "very depressed" and experiencing symptoms of paranoia.  (Tr. 524-526.)

The following day, on August 10, 2012, Ogletree began treatment with Anna-Lynn Tamayo-Reyes, M.D.  (Tr. 520-523.)  Ogletree reported "a difficult life"[4] and mental health treatment since the age of 15.  (Tr. 520.)  She complained of depressive episodes lasting "months at a time," with symptoms including impaired sleep, crying spells, decreased appetite, feelings of hopelessness, and intermittent suicidal thoughts.  (*Id.*)  Ogletree reported "feeling violent all the time," and endorsed "hearing voices snickering and laughing at her."  (*Id.*)  She also reported paranoia, stating she tried to work recently but "quit because she heard and felt someone in the basement building even though other people insisted that there was not."  (*Id.*)  Ogletree stated she needed help, and wanted to "get back on medications" and see a therapist.  (*Id.*)

On examination, Dr. Tamayo-Reyes noted cooperative behavior, good eye contact,

---

[4] Specifically, Ogletree stated her mother was an alcoholic who beat her with an extension cord and neglected the family.  (Tr. 520-521.)  She also reported that her brother sexually abused her at age 13, she lived in "multiple foster homes," and she was "sexually abused multiple times by different perpetrators."  (Tr. 520.)  She was in special education classes at school and dropped out after the 7th grade.  (Tr. 521.)  Ogletree relayed a history of suicide attempts (including "bang[ing] self," cutting her wrist, and drinking bleach), as well as "episodic aggression."  (Tr. 520.)  Ogletree also admitted to crack cocaine use beginning at age 21, during which she "was using all day every day." (Tr. 521.)  She stated her last use of alcohol and crack cocaine was in August 2009.  (*Id.*)  Finally, Ogletree reported multiple arrests and convictions for drug abuse, a four year term of incarceration for aggravated burglary, and three year term of incarceration for felonious assault.  (Tr. 522.)

normal speech, coherent and linear thought process, and intact cognition/memory.  (Tr. 522.)

She also, however, observed depressed and irritable mood, constricted affect "except for

tearfulness from time to time," auditory hallucinations, paranoia and delusions, and limited

impulse control.  (*Id.*)  Dr. Tamayo-Reyes diagnosed schizoaffective disorder, depressed type;

and alcohol and cocaine dependence.  (*Id.*)  She assessed a GAF of 45, indicating serious

symptoms, prescribed Seroquel and Celexa, and referred Ogletree for individual therapy.  (*Id.*)

On August 16, 2012, Ogletree presented to Ms. Mahoney.  (Tr. 519.)  She reported "her

mental health has affected her ability to work because she is very paranoid around a large group

of people, she has never worked her entire life, she has issues with depression that impact her

sleep as well as getting out and performing normal everyday tasks."  (*Id.*)  Ogletree did state,

however, her mental health symptoms were "better, since I got my new medications."  (*Id.*)

On August 24, 2012, Ogletree reported to Dr. Tamayo-Reyes that she was "feeling

better" and "not as depressed."  (Tr. 512.)  She stated her "mood swings are down" and "sleep is

improving."  (*Id.*)  Ogletree denied paranoia and indicated "she has not heard the voices since

being back on medications."  (Tr. 512-513.)  On examination, Dr. Tamayo-Reyes noted

cooperative behavior, good eye contact, normal speech, "better" mood, constricted affect,

coherent thought process, and fair insight/judgment.  (Tr. 513.)  She continued to diagnose

schizoaffective disorder, depressed type; and assessed a GAF of 55, indicating moderate

symptoms.  (*Id.*)

On August 29, 2012, Ogletree presented to R. Abdul Dollar, QMHS, and reported

spending time with her grandchildren, taking her medications as prescribed, and "run[ning]

groups in the shelter."  (Tr. 508.)  Mr. Dollar noted Ogletree "continues to benefit from group

6

discussions and participation." (*Id.*)

The following month, however, Ogletree reported to Ms. Mahoney that she was out of her medications and "her voices are severe." (Tr. 506.) On September 17, 2012, Ogletree presented to Susan O'Brien, RN. (Tr. 504-505.) Ogleetree stated "she has been taking meds as ordered," but reported "possible VH [i.e., visual hallucinations] (sees a police car following her/convinced it is doing so but looks back and it is gone) and TH [i.e., tactile hallucinations] (of things crawling on her skin)." (Tr. 504.) Ms. O'Brien noted "paranoid ideation is present." (*Id.*) Ogletree stated she had "thoughts of hurting others who she perceives are talking about her; she denies intent to do so and denies having hurt anyone in past month." (*Id.*) She reported decreased appetite but "better" sleep. (Tr. 505.) Two days later, Ogletree became tearful during a group session, stating she had "thoughts of getting high." (Tr. 502.)

Meanwhile, on September 14, 2012, Dr. Tamayo-Reyes opined Ogletree was not capable of managing or directing the management of benefits in her own best interests. (Tr. 500.) She stated Ogletree had a "serious mental illness," as well as "limited fund of knowledge and limited insight to her illnesses." (*Id.*) Dr. Tamayo-Reyes further found Ogletree's mental illness was "severe and chronic." (*Id.*)

On September 21, 2012, Ms. Mahoney completed an "Observational Statement from Case Manager or Outreach/Shelter Worker." (Tr. 496-497.) She concluded Ogletree's functioning was "poor" (i.e., "almost always a problem") in the areas of concentration, judgment, reliability, following simple instructions, and following program rules. (Tr. 496.)

On that same date, social worker Lindsay McMillion completed a Mental Status Questionnaire for the Ohio Department of Mental Health, Bureau of Disability Determination.

(Tr. 532-539.)  Ogletree reported decreased appetite, poor sleep, crying spells, feelings of hopelessness, mood swings, difficulty concentrating, and feelings of aggressiveness.  (Tr. 533-534, 535-536.)  She also complained of paranoid ideation (stating "I know they want to get me") and reported hallucinations, as follows:

> Client experiences auditory hallucinations.  She reports "I hear one voice.  They be telling me to go and kill myself.  No one cared about you."  She reports she experiences auditory hallucinations approximately every two weeks, "on and off." Client experiences visual hallucinations, "I see people following me.  There is one police that be following me, I don't know if he is trying to set me up or something. It ain't going to work."  Client is currently experiencing tactile hallucinations.  "I feel bugs crawling all over me. Do you see any?"  Client did not have bugs crawling on her person.

(Tr. 535.)

On mental status examination, Ms. McMillion found Ogletree was cooperative, oriented, and her dress and grooming were fair.  (Tr. 532.)  Ogletree's speech was pressured and rapid "at times," and her thought process was "loose and easily distracted."  (*Id.*)  Ms. McMillion noted Ogletree's "affect was incongruent to her mood, such as when reporting depressive symptoms or information, client was crying and smiling simultaneously."  (Tr. 533.)  Ms. McMillion stated Ogletree had poor eye contact, "became emotional during the evaluation," "experienced mood swings during the evaluation," and "rocked while seated . . . for 10 to 15 minutes in her chair." (Tr. 533-534.)  She found Ogletree had adequate insight and judgment and was "compliant with treatment, including medications, appointment, and group work."  (Tr. 537.)

Ms. McMillion diagnosed Ogletree with schizoaffective disorder, depressed type; alcohol and cocaine dependence; and antisocial personality disorder.  She assessed a GAF of 45, indicating serious symptoms.  (Tr. 538.)  In terms of Ogletree's work-related mental capabilities, Ms. McMillion found Ogletree was (1) markedly/extremely impaired in her ability to understand

8

and follow instructions "as evidenced by distractability, poor eye contact, inability to abstract and recall simple information;" (2) markedly impaired in her ability to maintain attention to perform simple, repetitive tasks; (3) extremely impaired in her ability to relate to others (including fellow workers and supervisors) "due to symptoms of paranoia, auditory and visual hallucinations, and antisocial traits;" and (4) extremely impaired in her ability to withstand the stress and pressures associated with day to day work activity "as evidenced by no work history beyond 2 days."  (Tr. 538.)

On October 5, 2012, Ogletree presented to Dr. Tamayo-Reyes, reporting paranoid thoughts, auditory hallucinations ("the voices sometimes tell her to kill herself"), bouts of depression, and crying spells.  (Tr. 552.)  Ogletree reported she had been compliant with her medications.  (*Id.*)  On examination, Dr. Tamayo-Reyes described Ogletree's behavior as "cooperative, quiet, intermittent eye contact, reptilian-like gaze."  (Tr. 553.)  She assessed depressed mood, flat affect, and impaired insight/judgment.  (*Id.*)  Dr. Tamayo-Reyes assessed a GAF of 45 and increased Ogletree's Seroquel dosage.  (*Id.*)

Ogletree returned to Dr. Tamayo-Reyes two weeks later and reported the "additional Seroquel XR dose is helping with the voices."  (Tr. 556.)  Ogletree stated she "still [had] paranoid delusions that two women [at the shelter] are undercover police but she is not as guarded."  (*Id.*)  She also indicated "she is fighting urges and devil's voices for her to use" drugs. (*Id.*)  Dr. Tamayo-Reyes noted Ogletree "appears more relaxed today compared to two weeks ago."  (Tr. 557.)  She also noted intermittent eye contact, "okay" mood, flat affect, "less auditory hallucinations," and impaired insight/judgment.  (*Id.*)  Dr. Tamayo-Ryes assessed a GAF of 50, and advised Ogletree to continue with the increased Seroquel dosage as well as continue with

9

Celexa.  (*Id.*)

On November 19, 2012, Ogletree returned to Dr. Tamayo-Reyes with complaints of increased depression and "crying for no reason."  (Tr. 686.)  With regard to Ogletree's paranoia and hallucinations, Dr. Tamayo-Reyes stated: "The auditory hallucinations and paranoid delusions have gone down.  She does not think that certain women at [the shelter] are undercover police.  However, the patient has ideas of reference.  She thinks that the CSI series she watches talks to her about killing herself."  (*Id.*)  In addition, Ogletree reported she was working on her GED, but having "a difficult time concentrating."  (*Id.*)  Dr. Tamayo-Reyes noted cooperative behavior, better eye contact, depressed mood, constricted affect, coherent thought process, impaired insight/judgment, and adequate impulse control.  (Tr. 687.)  She assessed a GAF of 50, and again increased Ogletree's Seroquel dosage.  (*Id.*)

Ogletree next presented to Dr. Tamayo-Reyes on December 21, 2012, reporting "auditory hallucinations are not prominent" but "recent stress with her son intensified some of the psychotic and mood symptoms."  (Tr. 688.)  Ogletree reported depressed mood, irritability, and feelings of aggressiveness.  (*Id.*)  Dr. Tamayo-Reyes noted continued paranoia, remarking Ogletree "thinks that police are after her."  (*Id.*)  She also observed intermittent eye contact, coherent thought process, depressed mood, blunted affect, impaired insight/judgment, and adequate impulse control.  (Tr. 689.)  She assessed a GAF of 45, and increased Ogletree's Seroquel dosage again.  (*Id.*)

On January 18, 2013, Ogletree advised Dr. Tamayo-Reyes that the higher dose of Seroquel was "making her sluggish."  (Tr. 691.)  She did report the medication "helps with voices," stating "[s]he does not hear them as much."  (*Id.*)  She continued to experience paranoia

"every now and then."  (*Id.*)  Her depression had improved, however, as had her sleep and appetite.  (*Id.*)  On examination, Dr. Tamayo-Reyes noted intermittent eye contact, "okay" mood, blunted affect, minimal paranoia, coherent thought process, impaired insight/judgment, and adequate impulse control.  (Tr. 692-693.)  She diagnosed schizoaffective disorder, depressed type, but noted "diminishing psychotic and mood symptoms."  (Tr. 693.)  Dr. Tamayo-Reyes again assessed a GAF of 45.  (*Id.*)

Ogletree returned to Dr. Tamayo-Reyes two months later, in March 2013, and reported doing "alright."  (Tr. 694.)  Ogletree reported minimal auditory hallucinations, stating "[i]t comes and goes, does not stay long, I guess because I am busy."  (*Id.*)  She still experienced paranoia, but was able to attend GED class two days per week.  (*Id.*)  Ogletree also reported attending NA meetings three times a week, and exercising in the gym twice per week for 20 minutes.  (*Id.*)  Dr. Tamayo-Reyes recorded similar mental status examination findings, including intermittent eye contact, "alright" mood, blunted affect, coherent thought process, "minimal paranoia," impaired insight/judgment, and adequate impulse control.  (Tr. 695.)  She continued to diagnose schizoaffective disorder, depressed type, again noting "diminishing psychotic and mood symptoms.'  (*Id*.)  Dr. Tamayo-Reyes assessed a GAF of 45.  (Tr. 696.)

On March 18, 2013, Dr. Tamayo-Reyes completed a Medical Source Statement regarding Ogletree's mental capacity.  (Tr. 750-751.)  She found Ogletree could frequently maintain appearance, manage funds/schedules, and leave the house on her own.  (*Id.*)  Ogletree could occasionally[5] follow work rules; maintain attention and concentration for extended periods of

---

[5]  The form defined "occasional" as "ability for activity exists for up to 1/3 of a work day."  (Tr. 750.)

two hour segments; function independently without redirection; understand, remember, and carry out simple job instructions; and behave in an emotionally stable manner.  (*Id*.)  Dr. Tamayo-Reyes assessed Ogletree's ability to perform all other job functions as rare, which the form defined as "activity cannot be performed for any appreciable time."  (*Id*.)  These activities included: use judgment; respond appropriately to changes in routine settings; deal with the public; relate to co-workers; interact with supervisors; work in coordination with or proximity to others without being distracted or distracting; deal with work stress; complete a normal workday or workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember, and carry out detailed and/or complex job instructions; socialize; and relate predictably in social situations.  (*Id*.)

In April 2013, Ogletree began treatment with Pu Cheng, M.D.  (Tr. 718-721.)  She reported hearing voices and seeing "a lot of dead bodies."  (Tr. 718.)  She expressed fear for the previous three weeks, stating that a "rapist is in town" and "he is my cousin."  (*Id*.)  Dr. Cheng noted Ogletree "appeared to be suspicious" and "kept checking around."  (*Id*.)  Ogletree "states that she's hearing voices during the interview.  She describes the voice as 'screaming, crying for help.'  'Sometimes TV is talking to me,' something bad is going to happen, police is part of that, they are following me.'"  (*Id.*)  Ogletree reported "compliance and response to medication."  (*Id*.)

On examination, Dr. Cheng noted a suspicious and guarded attitude, normal speech, depressed mood, suspicious and irritable affect, somewhat disorganized thought process, "prominent delusion of persecution," auditory hallucinations, and severely impaired insight and

12

judgment.  (Tr. 720.)  He concluded Ogletree was unstable and diagnosed schizoaffective

disorder, depressive type.  (*Id.*)  Dr. Cheng assessed a GAF of 45, and increased her Seroquel

dosage "for worsening psychosis."  (Tr. 721.)

On May 1, 2013, Ogletree reported "her depression has been getting worse."  (Tr. 956.)

A week later, she stated she had been taking all her medications daily but was still experiencing

auditory and visual hallucinations "sometimes."  (Tr. 951.)

Ogletree returned to Dr. Cheng on June 3, 2013.  (Tr. 944-947.)  She reported "not

hearing voices for about 3 weeks" and improved sleep.  (Tr. 944.)  Ogletree stated she attended

school two mornings per week for her GED, but had been told her "grades are too low."  (*Id.*)

On examination, Dr. Cheng noted suspicious and guarded attitude, "not very happy" mood,

suspicious and irritable affect, somewhat disorganized thought process, "prominent delusion of

persecution," no recent auditory hallucinations, and severely impaired insight and judgment.

(Tr. 946.)  He assessed schizoaffective disorder, which he described as "somewhat improved on

current regimen as no longer having active hallucinations, although still suspicious with paranoia

delusion."  (*Id.*)  He assigned a GAF of 45 and continued Ogletree on her medications.  (*Id.*)

Later that month, Ogletree reported feeling excited and happy because she got her own

apartment.  (Tr. 940, 941.)  She stated "she is still going to school and loving her new

apartment."  (Tr. 940.)  One of her therapists, Mr. Dollar, noted Ogletree continued to benefit

from group discussions and participation.  (*Id.*)

On August 7, 2013, Ogletree presented to Frank Townsley, BS, CDCA, SWA.  (Tr. 930-

931.)  She denied auditory or visual hallucinations, and stated she had no suicidal or homicidal

thoughts.  (Tr. 930.)  On August 14, 2013, Ogletree reported "she got married last Friday and

also will be taking her GED test next week." (Tr. 926.)  She also stated she was approved for a

vocational program and is "taking her medication as prescribed." (*Id*.)  On September 5, 2013,

Ogletree reported to Mr. Townsley that "she is med compliant, no mental health issues nor any

suicidal or homicidal ideations at the present time." (Tr. 921.)  She further stated "school was

well," "housing is comfortable," and "she is going to be chairing her home group next month."

(*Id*.)  Several weeks later, on September 25, 2013, Ogletree denied hallucinations and stated she

was enjoying "tech school." (Tr. 918.)  Ogletree again denied hallucinations on October 15,

2013, and "reported she has enjoyed being at the vocational tech school and has a positive

relationship with her" case manager.  (Tr. 917.)

On October 28, 2013, however, she returned to Dr. Cheng and admitted non-compliance

with her medication.  (Tr. 912.)  She reported feeling paranoid and hearing voices, stating it

"comes and goes." (*Id.*)  Ogletree also complained of depression and stated she had recently

contemplated suicide by "cutting [her]self and walking into traffic." (*Id*.)  She reported

increased irritability and distrust of her neighbors, stating she always draws the curtains in her

apartment "so people will not peek into it." (*Id*.)

On examination, Dr. Cheng noted suspicious and guarded behavior, normal speech, "not

very happy mood," an irritable and mildly labile affect, somewhat disorganized thought process,

prominent delusion of persecution, active and ongoing auditory hallucinations, and severely

impaired insight and judgment.  (Tr. 913-914.)  He assessed a GAF of 45, discontinued Seroquel,

and prescribed Latuda "for psychosis." (Tr. 914.)

On that same date, Dr. Cheng completed a Medical Source Statement regarding

Ogletree's Mental Capacity.  (Tr. 777-778.)  He found she could frequently understand,

remember, and carry out simple job instructions; maintain appearance; and leave home on her own. (*Id*.) Dr. Cheng further concluded Ogletree could occasionally deal with the public, relate to coworkers, function independently without redirection, and understand, remember, and carry out both detailed and complex job instructions. (*Id*.) Only rarely, however, could Ogletree perform the following job functions: follow work rules, use judgment, maintain attention and concentration for extended periods of two hour segments, respond appropriately to changes in routine settings, maintain regular attendance and be punctual within customary tolerance, interact with supervisors, work in coordination with or proximity to others without being distracted or distracting, deal with work stress, complete a normal workday or workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, socialize, behave in an emotionally stable manner, relate predictably in social situations, or manage funds/schedules. (*Id.*)

Ogletree returned to Dr. Cheng on December 2, 2013. (Tr. 905-908.) She refused to take Latuda, stating "she is suspicious that [Dr. Cheng] might put something into Latuda and that was her reason of refusing." (Tr. 905.) Ogletree also expressed suspicion regarding her primary care physician, as well. (*Id*.) She reported the voices still "come and go," but it was "less intense comparing to previous." (*Id.*) Ogletree stated she felt very good, but Dr. Cheng noticed that, "at the same time," Ogletree reported she "often cr[ies] in the morning without obvious reasons." (*Id*.)

On examination, Dr. Cheng noted suspicious and guarded behavior, normal speech, "not very happy" mood, an irritable and suspicious affect, somewhat disorganized thought process, prominent delusion of persecution, active and ongoing auditory hallucinations, and severely

15

impaired insight and judgment.  (Tr. 906-907.)  He assessed a GAF of 45, and restarted Ogletree on Seroquel because "patient feels safe to stay on that."  (Tr. 907.)

On December 16, 2013, Ogletree reported she was medication compliant and not experiencing auditory or visual hallucinations.  (Tr. 902, 904.)  She stated she was still "chair" at the women's shelter meeting and "that has kept her rooted in recovery."  (Tr. 904.)  She also reported, however that "I go in and out of my depression spells, I feel like people be watching me and talking about me."  (Tr. 902.)

On February 6, 2014, Ogletree presented to Dr. Cheng with complaints of continuing mood swings.  (Tr. 895.)  She reported visual hallucinations, including "faces and shadows" and the devil.  (*Id.*)  Ogletree also endorsed "hearing voices," although she stated it was "somewhat less often than previous."  (*Id.*)  She stated she feels someone is following her and trying to "set her up."  (*Id.*)  She admitted she did not trust Dr. Cheng and did not "feel very safe sitting in the office."  (*Id.*)  Ogletree complained of depression and crying spells, and was noted to be "rocking back and forth on the chair" during the examination.  (*Id.*)

On examination, Dr. Cheng again noted suspicious and guarded behavior, normal speech, "not very happy" mood, an irritable and suspicious affect, somewhat disorganized thought process, prominent delusion of persecution, active and ongoing auditory hallucinations, and severely impaired insight and judgment.  (Tr. 896-897.)  He stated "[a]lthough patient reports self-improvement, clinical presentation remains much the same, but patient is not willing to accept medication adjustment."  (Tr. 897.)  Dr. Cheng continued to diagnose schizoaffective disorder, depressive type; and assessed a GAF of 45.  (*Id.*)

On February 25, 2014, Ogletree returned to Mr. Townsley and reported she was grieving

16

due to the recent loss of her daughter in a car accident.  (Tr. 891.)  She denied any hallucinations or suicidal thoughts.  (*Id*.)  She again denied hallucinations on March 10 and 13, 2014.  (Tr. 888, 890.)

Ogletree returned to Dr. Cheng on March 13, 2014.  (Tr. 884-887.)  She reported "mood is fine, doing better," but then became tearful when disclosing the recent death of her daughter. (Tr. 884.)  Ogletree reported she got a part time job working in a cafeteria, which helped her with her self-esteem.  (*Id*.)  On examination, Dr. Cheng noted findings similar to previous examinations.  (Tr. 886.)  He assessed "[d]isorganized thoughts, prominent delusion and ongoing visual and auditory hallucinations, along with depressive mood.  Recent stressor of daughter's tragic death worsening mood symptom, but not much of psychosis, appears to be a normal grief." (*Id*.)  Dr. Cheng again assigned a GAF of 45 and continued Ogletree on current dose of Seroquel, noting "patient refuses dose increase."  (*Id*.)

On March 24, 2014, Dr. Cheng completed another Medical Source Statement regarding Ogletree's Mental Capacity.  (Tr. 790-791.)  He found she could frequently respond appropriately to changes in routine settings, deal with the public, relate to coworkers, interact with supervisors, work in coordination with or proximity to others without being distracted or distracting, deal with work stress, socialize, behave in an emotionally stable manner, relate predictably in social situations, and understand, remember, and carry out complex job instructions.  (*Id*.)  Dr. Cheng further concluded Ogletree could occasionally follow work rules, use judgment, maintain attention and concentration for extended periods of two hour segments, maintain regular attendance and be punctual within customary tolerance, function independently without redirection, complete a normal workday or workweek without interruption from

17

psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, manage funds/schedules, and understand, remember and carry out detailed but not complex job instructions.  (*Id.*)  He found she could only rarely maintain appearance, leave her home on her own, or understand, remember, and carry out simple job instructions.  (*Id.*)

In April 2014, Ogletree reported to Kristen Mensah, LPN, that she was "fine" and "feeling good about [her]self."  (Tr. 879.)  She stated she had been working at a café two times per month, and spending time with her grandchildren.  (*Id.*) Ms. Mensah noted Ogletree "appears more cooperative and less depressed, more engaged with writer," although she did note "avoidant eye contact."  (*Id.*)  That same month, Ogletree presented to Mr. Townsley and denied auditory and visual hallucinations.  (Tr.  874, 877, 878.)

Ogletree returned to Ms. Mensah in May 2014.  (Tr. 872.)  She stated her mood was "fine but it is up and down," and her depression was "off and on."  (*Id*.)  Ogletree reported she continued to work at the café two times per month "or whenever they call me."  (*Id*.)

On June 2, 2014, Ogletree reported she was medication compliant and denied hallucinations.  (Tr. 969.)  She described her mood as "up and down," but stated "I'm doing alright."  (*Id*.)  Ogletree indicated she would be working at the café at the end of the month.  (*Id*.)

**C.     State Agency Reports**

On November 19, 2012, state agency psychologist Tonnie Hoyle, Psy.D., reviewed Ogletree's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 312-313.)  Dr. Hoyle determined Ogletree had moderate restrictions in her activities of daily living, social functioning, and in maintaining concentration, persistence and pace.  (Tr. 312.)  She

further found Ogletree had no repeated episodes of decompensation, each of extended duration.
(*Id.*)

Dr. Hoyle also completed a Mental Residual Functional Capacity ("RFC") Assessment, in which she adopted the mental RFC set forth in the previous ALJ decision dated August 17, 2011.  (Tr. 314.)  The mental limitations set forth in the previous ALJ's RFC determination were as follows:   "She is limited to tasks that are simple, routine, low-stress and not in the public. She is precluded from tasks that involve high production quotas, strict time requirements, arbitration, negotiation, confrontation, directing the work of others, and being responsible for the safety of others.  Moreover, she is limited to tasks that involve no interaction with the public and only superficial interaction with supervisors and co-workers."  (Tr. 292.)

On March 22, 2013, state agency psychologist Karla Voyten, Ph.D., reviewed Ogletree's records and completed a PRT and mental RFC.  (Tr. 325-328.)  Dr. Voyten reached the same conclusions as Dr. Hoyle.  (*Id.*)

**D.      Hearing Testimony**

During the June 5, 2014 hearing, Ogletree testified to the following:

- She lives by herself in a subsidized one bedroom apartment.  (Tr. 263.)  She was married but is no longer with her husband.  (Tr. 264.)  She separated from her husband eight months prior to the hearing.  (*Id.*)

- She completed the eighth grade.  She can read and do simple math.  (Tr. 264-265.)

- She suffers from COPD, and arthritis/pain in her legs, arms, and hands.  (Tr. 265.)  She also experiences pain in her lower back.  The pain "comes and goes" and is a 7 on a scale of 10 on most days.  (*Id.*)  She takes prescription strength Motrin and a muscle relaxer for her pain.  (Tr. 266.)  Her doctor wanted to prescribe Percocet, but she refused this medication because she is a recovering addict.  (*Id.*)  She uses a cane sometimes.  (*Id.*)

- She can stand and walk for an hour each before needing to sit down.  (Tr. 267.)
  She can sit for "a long time."  (Tr. 268.)  She can bend, stoop, and squat; and
  can pick up a gallon of milk with her hands.  (*Id.*)  She can lift ten pounds.  (*Id.*)

- She used to drink and do drugs, including crack.  (Tr. 269-270.)  She has not
  used any drugs or alcohol since she was released from prison.  (Tr. 275.)  The
  last time she used drugs was on August 14, 2009.  (Tr. 269-270.)  She goes to
  Narcotics Anonymous meetings four times per week with a friend.  (Tr. 272.)
  These meetings are at four different locations.  (Tr. 272-273.)  She takes the bus
  to get there, and has no problems understanding the bus schedule.  (*Id.*)

- She cannot work because she "[does not] like to be around a lot of people."  (Tr.
  265.)  She sees a mental health counselor once every two weeks.  (Tr. 273-274.)
  She has also seen a psychiatrist, Dr. Cheng, for about a year.  (*Id.*)  Before that,
  she treated with a different psychiatrist, Dr. Tamayo-Reyes.  (*Id.*)  She takes
  various medications for schizophrenia and personality disorder, including
  Seroquel, Celexa and Topex.  (Tr. 274, 276.)

- She hears voices and feels like people are following her.  (Tr. 274-275.)  When
  she takes her medication, she hears the voices less often but still hears them.
  (Tr. 275.)  Even with medication, she feels that people are following her but
  "it's not like bad like it was when I first came home" from prison.  (*Id.*)

- She can shower, wash her hair, and get dressed by herself.  (Tr. 270-271.)  She
  keeps her house clean, goes shopping, and does the laundry.  (*Id.*)  She prepares
  microwave meals for herself.  (Tr. 271.)  She enjoys listening to gospel music
  and reading romance novels.  (Tr. 271, 273.)  She goes to church, and to her
  Narcotics Anonymous meetings.  (Tr. 272-273.)  She does not spend time with
  family because "they all do drugs."  (Tr. 273.)

- She has a job coach at Vocational Guidance Services, who helps her find
  suitable part-time work.  (Tr. 276.)  With the help of her coach, she found a part-
  time job at a coffee shop.  (Tr. 277.)  Her job coach "had to sit with me for two
  weeks to see if I could do the job."  (*Id.*)  She worked three to four hours per
  week at this job, but is no longer working there.  (*Id.*)  She explained that: "I
  didn't get fired.  I still can go to work – like say when they call us or when they
  call us — it's like a spindown program to pay – help pay for your medicine."
  (*Id.*)

The ALJ determined Ogletree had no past relevant work.  (Tr. 279.)  The ALJ then posed

the following hypothetical question:

I'm going to ask you to assume an individual who is 46, soon to be 47, has an

20

eighth grade education, can read and write simple English, perform simple arithmetic, again no work background.  This individual is limited to work of light exertion requirements but she has additional non-exertional limitations, specifically no concentrated exposure to temperature extremes, humidity or environmental pollutants.  And mental limitations that she perform simple low stress tasks, specifically no fast paced strict quotas or frequent duty changes; without interactions with the general public; and superficial interpersonal interactions with supervisors and coworkers.  And by superficial interpersonal interactions, I mean no arbitration, negotiation, application, directing the work of others or being responsible for the safety of others.  Are there jobs that exist in this economy, national economy that this individual can perform?

(Tr. 279-280.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as packer (light, unskilled, SVP 2); bench assembler (light, unskilled, SVP 2); and sorter (light, unskilled, SVP 2).  (Tr. 280-281.)

The ALJ then asked a second hypothetical that was the same as the first, but added the limitation that "due to symptoms of medically determinable impairments this individual would be off task at least 20 percent of the time."  (Tr.  281.)  The VE testified such a hypothetical individual would not be able to perform jobs existing in significant numbers in the economy.  (*Id.*)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594

F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since September 28, 2012, the application date. (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: schizoaffective disorder, borderline intellectual functioning, antisocial personality disorder, history of drug and alcohol abuse, history of asthma, history of hepatitis C, and history of plantar fasciitis (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 416.945) to perform light work as defined in 20 CFR 416.967(b) except: no concentrated exposure to temperature extremes, humidity or environmental pollutants; and mental limitations that she perform simple, low stress tasks (no fast pace, strict quotas, or frequent duty changes), without interactions with the general public, and with superficial interpersonal interactions with supervisors and coworkers (no arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others) (20 CFR 416.969a).

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on July ** 1967 and was 45 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since September 28, 2012, the date the application was filed (20 CFR 416.920(g)).

(Tr. 242-252.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the

Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at

* 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether

23

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.

24

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI.  ANALYSIS[6]

***Drummond***[7]

Ogletree argues the ALJ improperly adopted the prior ALJ's RFC findings pursuant to *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997) and Acquiescence Ruling 98-4(6), 1998 WL 283902 (June 1, 1998) ("AR 98-4(6)") because the record contains new and material evidence demonstrating a severe impairment that was not considered by the previous ALJ.  (Doc. No. 15 at 15.)  Specifically, Ogletree maintains the ALJ's "application of *Drummond* is erroneous because the current hearing decision found [that she had] a new severe impairment, schizoaffective disorder, and discussed the psychotic symptoms of this disorder in detail."  (*Id.*)  She also asserts that, "in contrast with the last hearing decision, during the applicable claim period Ms. Ogletree has maintained her sobriety."  (*Id.* at 16.)  Ogletree claims her impairments, symptoms, and circumstances materially changed and, therefore, "*res judicata* should not have been applied."  (*Id.*)

---

[6]  The Court notes that, on September 26, 2016, the Social Security Administration issued Revised Medical Criteria for Evaluating Mental Disorders, Final Rule (81 Fed. Reg. 66138).  These rules do not impact the Court's decision, as they do not become effective until January 17, 2017.  Indeed, the Final Rule expressly provides that: "[T]hese final rules will be effective on January 17, 2017.  We delayed the effective date of the rules to give us time to update our systems, provide training and guidance to all of our adjudicators, and revise our internal forms and notices before we implement the final rules. The prior rules will continue to apply until the effective date of these final rules." (*Id*.) The Final Rule further provides that "[w]e expect that Federal courts will review our final decision using the rules that were in effect at the time we issued the decisions."  (*Id.* at fn 1.)

[7]  In her Brief on the Merits, Ogletree asserts error under *Drummond* as her third assignment of error, following arguments regarding the ALJ's weighing of the opinion evidence and step three findings.  The Court believes, however, that the issues raised in Ogletree's third assignment of error regarding the ALJ's application of *Drummond* need to be resolved prior to reviewing her other arguments.

The Commissioner argues the ALJ did not improperly adopt the previous RFC pursuant to *Drummond* and AR 98-4(6).  (Doc. No. 17 at 17.)  She argues that "while the prior ALJ did not identify schizoaffective disorder as one of Plaintiff's mental impairments and did not explicitly refer to psychotic symptoms in his review of the medical record, material aspects of the record remained unchanged."  (*Id.* at 17.)  In particular, the Commissioner emphasizes that both the prior and the current ALJ found that medication effectively controlled Ogletree's symptoms.  Finally, the Commissioner argues that "even if new medical evidence demonstrated a change in Plaintiff's condition, making the application of *Drummond* inappropriate, the residual functional capacity formulated by the ALJ reasonably accommodates Plaintiff's various impairments and resulting limitations."  (*Id.* at 18.)

In *Drummond* , the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."  *Drummond*, 126 F.3d at 842 (relying on *Senters v. Sec'y of Health & Human Servs.*, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam).  *See also Dennard v. Sec'y of Health & Human Servs.*, 907 F.2d 598 (6th Cir.1990) (per curiam); *Blankenship v. Comm'r of Soc. Sec.*, 624 Fed. Appx. 419, 425 (6th Cir. Aug. 26, 2015).  In that case, Drummond's initial claim for SSI was denied when an ALJ found that Drummond retained a RFC for sedentary work.  *Drummond*, 126 F.3d. at 838.  When Drummond later re-filed her disability claim, a second ALJ found that Drummond retained a RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim.  *Id*. at 839.  After explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC

27

determination of the first ALJ because there was no new or additional evidence of an improvement in Drummond's condition. *Id*. at 841-842. "Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id.*

In response to *Drummond*, the Social Security Administration promulgated Acquiescence Ruling 98–4(6). The Administration explained:

> This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level. It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.
>
> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98–4(6) (S.S.A.), 1998 WL 283902, at *3 (1998) (emphasis added) (footnote omitted).

As the Sixth Circuit recently explained, "[r]ead together, *Drummond* and Acquiescence Ruling 98–4(6) clearly establish that a subsequent ALJ is bound by the legal and factual findings of a prior ALJ unless the claimant presents new and material evidence that there has been either a change in the law or a change in the claimant's condition." *Blankenship*, 624 Fed. Appx. at 425. "New" evidence is evidence "'not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding.'" *Schmiedebusch v. Comm'r of Soc. Sec.*, 2013 WL 5749156 at * 9 (6th Cir. Oct. 24, 2013)

(quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)).

With regard to materiality, a claimant "must demonstrate that there was a reasonable probability

that the Secretary would have reached a different disposition of the disability claim if presented

with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th

Cir.1988).  *See also Schiedebusch*, 2013 WL 5749156 at * 9.

Here, Ogletree filed her first application for SSI in November 2008, alleging disability

since November 1982 due to asthma, hepatitis C, borderline intellectual functioning, and mental

illness.  (Tr. 287-289.)  After her application was denied, both initially and on upon

reconsideration, a video hearing was conducted before an ALJ on February 7, 2011, at which

time Ogletree and an impartial VE testified.[8]  (Tr. 287.)  In a written decision dated August 17,

2011, the ALJ considered the medical evidence regarding Ogletree's physical and mental

impairments.  (Tr. 292-293.)  Based on this evidence, as well as the opinion evidence, the ALJ

determined Ogletree had the following severe impairments: substance addiction disorder,

antisocial personality disorder, dysthymic disorder, borderline intellectual functioning, asthma,

and hepatitis C.  (Tr. 289.)

The ALJ next determined Ogletree's impairments, either singularly or in combination,

did not meet or equal one listed in 20 CFR Part 404, Subpt P, App 1.  (Tr. 289-291.)

Specifically, with regard to Ogletree's mental impairments, the ALJ determined Ogletree did not

meet or equal the criteria for Listings 12.04, 12.08, or 12.09, finding she was only moderately

restricted in her activities of daily living, social functioning, and concentration, persistence, and

---

[8] The record reflects Ogletree was incarcerated at the time of the hearing and, although
advised of her right to be represented, elected to proceed without counsel.  (Tr. 287.)

pace.  (*Id.*)

At step four of the sequential analysis, the ALJ noted, summarily, that Ogletree "has alleged depressed mood, isolative tendencies, trust issues, auditory hallucinations, anger management issues, and suicidal ideations and attempts."  (Tr. 292.)  He found, however, her statements concerning the intensity, persistence, and limiting effects of these symptoms were "not credible" in light of evidence she improved with treatment.  (Tr. 293.)  Specifically, he found as follows:

> The claimant's medical treatment history and compliance with treatment support the nonexertional mental restrictions addressed in my assessment of the claimant's residual functional capacity since November 26, 2008. Specifically, the medical record indicates that the claimant's symptoms are well controlled with treatment.  For instance, the claimant's treating and licensed psychiatrist M. Ahmed, M.D. observed that once the claimant was 'doing well' and looked 'happier.' (Exhibit 27F, page 5.)  At this appointment, she denied a depressive mood or hopelessness. (Exhibit 27F, page 5.)  Significantly, Dr. Ahmed reported that the claimant expressed a desire to work on her anger management issues, which showed that the claimant was able to recognize her actions when she is compliant with treatment.  (Exhibit 27F, page 5; see also Exhibit 28F).  Accordingly, I have found that the claimant's medical treatment history and compliance support the nonexertional mental restrictions in my assessment of the claimant's residual functional capacity.

> I have also taken into consideration the claimant's substance addiction disorder.  The record indicates that she has not been able to maintain abstinence since November 26, 2008.  Although the claimant testified that she received in-patient detoxification at St. Vincent Charity Hospital, the medical record does not include evidence that she required any emergency room visits or periods of hospitalization to treat acute episodes of intoxication.  (See e.g., Exhibit 26F).  Accordingly, I have found that the claimant's drug and alcohol consumption pattern in and of itself preclude substantial gainful activity in accord with my assessment of the claimant's residual functional capacity since November 2008.

(Tr. 293.)  The ALJ then considered the opinion evidence, according only "partial weight" to the opinions of the state agency records-reviewing psychological consultants because the evidence,

30

"as whole, establish that the claimant's mental impairments have imposed greater limitations than they have opined."  (*Id*.)  The ALJ gave "little weight" to the opinion of psychological consultative examiner David V. House, Ph.D.., "because although I have considered the claimant's borderline intellectual functioning to limit her work-related functioning, the medical evidence does not support the severe cognitive impairments that he found."  (*Id*.)  Finally, the ALJ declined to give substantial weight to the opinion of Ogletree's social worker, Christine Lamp, on the grounds it "does not provide any new and persuasive evidence regarding the claimant's impairments and is not based on a longitudinal treatment history with the claimant."[9] (*Id*.)

The ALJ then assessed the following RFC:

> The claimant retains the residual functional capacity to perform light work (with normal breaks) as defined in 20 CFR 416.967(b) with the following additional limitations.  The claimant must avoid concentrated exposure to extreme heat (in excess of 85 degrees Fahrenheit), fumes, odors, dust, gases, and poorly ventilated areas.  She is also limited to tasks that are simple routine, low-stress, and not in the public.  She is precluded from tasks that involve high production quotas, strict time requirements, arbitration, negotiation, confrontation, directing the work of others, and being responsible for the safety of others.  Moreover, she [is] limited to tasks that involve no interaction with the public and only superficial interaction with supervisors and coworkers.

(Tr. 292.)  Based on the testimony of the VE, the ALJ concluded Ogletree was able to perform representative jobs in the economy such as small products assembler, inspector/hand packager, and printed products assembler.  (Tr. 294.)  Accordingly, the ALJ determined Ogletree "has not

---

[9] In their briefs, the parties did not discuss, in any detail, the medical or opinion evidence before the previous ALJ, nor do they state whether any of such evidence is located in the record currently before this Court.  Thus, the content of medical and opinion evidence before the previous ALJ can only be gleaned from his discussion of this evidence in his written decision dated August 17, 2011.

31

been under a disability, as defined in the Social Security Act, since November 26, 2008, the date

the application was filed." (Tr. 295.)  This decision was upheld by the Appeals Council on

August 13, 2012.  (Tr.  301.)  It does not appear Ogletree pursued a further appeal.

Ogletree filed her second application for SSI on September 28, 2012, alleging a

disability onset date of September 13, 2011 (one month after the previous ALJ decision).  (Tr.

242.)  At the outset, the second ALJ acknowledged the previous ALJ decision and found as

follows:

> Procedurally, in *Drummond v. Comm'r of Soc. Sec.*, the Sixth Circuit held that the
> principle of *res judicata* applied and that the prior Administrative Law Judge's
> findings as to residual functional capacity were binding on the Social Security
> Administration in subsequent claims in the absence of new and additional
> evidence or changed circumstances.  (*See* 126 F.3d 837 (6th Cir. 1997); AR 98-
> 4(6)).  Upon careful consideration of the medical evidence, the undersigned finds
> that there is no new and material evidence regarding the claimant's physical or
> mental condition, and therefore has adopted the residual functional capacity set
> forth in the prior decision.

(*Id.*)  The ALJ then found Ogletree suffered from a variety of physical and mental impairments,

some of which were found to be severe impairments by the first ALJ and some of which were

not.  Specifically, the second ALJ found Ogletree suffered from the severe impairments of

schizoaffective disorder, borderline intellectual functioning, antisocial personality disorder,

history of drug and alcohol abuse, history of asthma, history of hepatitis C, and history of plantar

fasciitis.  (Tr. 244.)  The ALJ determined Ogletree's imparments, considered singly and in

combination, did not meet or equal a Listing, including Listings 1204, 12.05, 12.08, and 12.09.

(Tr. 245.)  Like the first ALJ, the second ALJ found, at step three, that Ogletree was only

moderately restricted in her activities of daily living, social functioning, and concentration,

persistence, and pace.  (Tr. 245-246.)

32

The decision goes on to discuss the medical evidence regarding Ogletree's physical and mental impairments.  With regard to Ogletree's mental impairments, the ALJ analyzes the medical evidence as follows:

> In this case, the claimant's primary limitations are associated with her mental impairments.  (Exhs. B3E, B4E.)  However, as discussed in the previous Administrative Law Judge's decision, the medical record indicates the claimant's are well controlled with treatment.  (Exh. B1A, p. 10).  Upon careful consideration of the evidence the undersigned finds no evidence exists that demonstrates a worsening in the claimant's mental condition as to preclude the application of *Drummond* (AR 98-4(6)).  Specifically, incarceration and community release mental health records dated April 26, 2012, show the claimant had not taken psychiatric medication since May 2011 and "has maintained function and stability."  (Exh. B1F, p. 7.)  Follow-up notes dated July 26, 2012 show the claimant complained of paranoia, and, during this visit, had poor eye contact.  (Exh. B2F, p. 4.)  However, the record shows the claimant was released from prison just one day prior and had not undergone proper treatment.  (Exh. B11F, p. 5.)  In this case, the record shows with proper treatment the claimant's symptoms improved.  For example, during a visit on August 24, 2012, the claimant reported she was compliant with medication and in a better mood.  The claimant's mental status findings during this visit revealed constricted affect, but linear thought process, fair insight and judgment, and normal memory.  The claimant also denied any suicidal ideation or paranoia and instead demonstrated adequate impulse control (Exh. B5F, p. 11.)  While the claimant's mood fluctuated when non-compliant with medication, when complaint with medication, her overall mental status findings remained relatively unremarkable with linear thought process, fair insight and judgment, normal memory and adequate impulse control and her global assessment of functioning (GAF) scores indicated no more than moderate limitations.  (Exhs. B7F, pp 18; B11F, pp 15; B27F, pp. 17, 64, 84).

(Tr. 249.)  The ALJ also noted Ogletree was able to participate in group therapy, expressed the desire to look for part-time work, spent time with her grandchildren, was attending school to obtain her GED, recently got married, and reported she "ran groups" at the shelter.  (*Id*.)  The ALJ further found that "during office visits for treatment of her physical conditions, medical professionals consistently found the claimant in no distress, alert, cooperative and oriented to all

33

spheres, all of which are inconsistent with debilitating mental health impairments." (*Id.*)  Lastly, the ALJ acknowledged the record showed Ogletree has been "sober" for three years and "her drug and alcohol use are now in remission."  (Tr. 249-250.)

The ALJ then concluded Ogletree had failed to produce new and material evidence sufficient to warrant departure from the previous RFC assessment.  (*Id.*)  In so finding, the ALJ noted state agency physicians reviewed Ogletree's medical records and adopted the RFC from the previous decision.  (Tr. 250.)  The ALJ accorded "great weight" to these physicians' opinions "because they are well supported by the record as a whole as discussed in detail above." (*Id.*) The ALJ also acknowledged the opinions of Drs. Tamayo-Reyes and Cheng, Ms. Mahoney, and Ms. McMillion, noting "all of the aforementioned opinions indicate overall the claimant's mental impairments cause extreme limitations." (*Id.*)  The decision does not specify how much weight, if any, the ALJ accorded these opinions, but it appears he implicitly rejected them.  Indeed, the ALJ noted, again, that the "record shows the claimant's mental health symptoms improve with medication treatment and compliance," and emphasized Ogletree's reported ability to "go to school, spend time with her grandchildren, work in a café in some capacity, and get married." (*Id.*)

Based on the VE testimony, the ALJ concluded Ogletree could perform representative jobs such as packer, bench assembler, and sorter.  (Tr. 252.)  He found Ogletree "has not been under a disability, as defined in the Social Security Act, since September 28, 2012, the date the application was filed." (*Id.*)

The Court finds the ALJ's determination that there was no new and material evidence demonstrating a worsening of Ogletree's mental impairments is not supported by substantial

evidence.  Although the first ALJ decision briefly mentions Ogletree's allegation that her symptoms included depression and auditory hallucinations, there is no discussion in that decision of the serious psychotic symptoms that are later identified in the treatment notes of Dr. Tamayo-Reyes and Dr. Cheng, as well as Ogletree's other mental health care providers.  As set forth *supra*, even after Ogletree's release from prison and treatment with medication and counseling, she continued to report paranoid delusions as well as auditory, visual, and tactile hallucinations.  For example, in September 2012, Ogletree reported "severe" voices, paranoid ideations, and "things crawling on her skin."  (Tr.  504-506, 535.)  In October 2012, she reported voices telling her to kill herself and paranoid delusions that two women at the shelter were undercover police officers.  (Tr. 552.)  After an increase in her Seroquel dosage, Ogletree reported the hallucinations and paranoia had "gone down," but nonetheless told Dr. Tamayo-Reyes that the television show she watched "talks to her about killing herself."  (Tr.  686.)  Even with Ogletree's reports of decreased hallucinations and paranoia, Dr. Tamayo-Reyes assessed blunted affect, impaired insight and judgment, and a GAF of 45, indicating serious symptoms.  (Tr. 695-696.)

In 2013, Dr. Cheng continued to note auditory and visual hallucinations (e.g., hearing voices and seeing dead bodies) as well as paranoid delusions.  (Tr. 718-721, 951.)  While increased medication appeared to decrease Ogletree's auditory hallucinations somewhat, Dr. Cheng noted she was "still suspicious with paranoia delusion."  (Tr. 946.)  He assessed a "somewhat disorganized thought process," "severely impaired insight and judgment," and a GAF of 45.  (*Id.*)  Paranoia and hallucinations were reported again in October 2013, along with thoughts of suicide by "cutting [her]self and walking into traffic."  (Tr. 912.)  At that time, Dr.

Cheng noted "prominent delusion of persecution, active and ongoing auditory hallucinations, and severely impaired insight and judgment."  (Tr. 913-914.)  Similar examination findings are noted in December 2013 and February and March 2014, as well.  (Tr. 905-908, 896-897, 884-887.)  Significantly, Dr. Cheng noted that "although patient reports self-improvement, clinical presentation remains much the same."  (Tr. 897.)  Throughout 2013 and early 2014, Dr. Cheng consistently assessed a GAF of 45, indicating serious symptoms.  (Tr. 721, 946, 914, 907, 897, 886.)  The previous ALJ decision contains no discussion of the severe psychotic symptoms discussed above.

Moreover, subsequent to the first ALJ decision, both Dr. Tamayo-Reyes and Dr. Cheng provided opinions regarding Ogletree's severely limited mental functioning.  (Tr. 750-751, 777-778, 790-791.)  In March 18, 2013, Dr. Tamayo-Reyes found Ogletree could only rarely[10] use judgment; respond appropriately to changes in routine settings; deal with the public; relate to co-workers; interact with supervisors; work in coordination with or proximity to others without being distracted or distracting; deal with work stress; complete a normal workday or workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember, and carry out detailed and/or complex job instructions; socialize; and relate predictably in social situations.  (*Id*.)  One year later, in March 2014, Dr. Cheng implicitly acknowledged some improvement,[11]

[10] The term "rare" is defined on the form completed by Dr. Tamayo-Reyes as "activity cannot be performed for any appreciable time."  (Tr. 750.)

[11]  Previously, in October 2013, Dr. Cheng found Ogletree could rarely perform most work-related functions and occasionally deal with the public, relate to coworkers, function independently without redirection, and understand, remember, and carry out both detailed and complex job instructions.  (*Id.*)  Dr. Cheng's later opinion, in March

36

but nonetheless concluded Ogletree could only occasionally (i.e., for up to 1/3 of a work day) follow work rules, use judgment, maintain attention and concentration for extended periods of two hour segments, maintain regular attendance and be punctual within customary tolerance, function independently without redirection, complete a normal workday or workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, manage funds/schedules, and understand, remember and carry out detailed but not complex job instructions.  (Tr. 790-791.)

The ALJ found these treating physician opinions, as well as the treatment notes discussed *supra*, did not constitute "new and material" evidence because "the record shows with proper treatment the claimant's symptoms improved."  (Tr. 249.)  This finding is not supported by substantial evidence.  The ALJ cites a single treatment visit on August 24, 2012 during which Ogletree reported she was compliant with medication and "in a better mood."  (*Id.*)  The ALJ fails, however, to acknowledge the multitude of subsequent visits where Ogletree, despite being compliant with medications, reported paranoid delusions and auditory, visual, and/or tactile hallucinations, including voices telling her to kill herself and visions of dead bodies and "things" crawling on her.  (Tr. 504-506, 535, 552, 686, 718-721, 912, 951.)  Nor does the ALJ acknowledge consistent examination findings (subsequent to the August 24, 2012 treatment note mentioned in the decision) of "somewhat disorganized thought process," "prominent delusion of persecution," "active and ongoing auditory hallucinations," and impaired or severely impaired insight and judgment.  (Tr. 896-897, 906-907, 913-914, 720, 689.)  Finally, while the ALJ cites

---

2014, found she could perform more work-related functions on an occasional, rather than rare, basis.

GAF scores indicating "no more than moderate limitations," the decision does not acknowledge the many GAF scores in the record showing serious impairment, including findings of  GAFs of 45 in September 2012 (Tr. 538), October 2012 (Tr. 553), December 2012 (Tr. 689), January 2013 (Tr. 693), March 2013 (Tr. 696), April 2013 (Tr. 721), June 2013 (Tr. 946), October 2013 (Tr. 914), December 2013 (Tr. 907), February 2014 (Tr. 897), and March 2014 (Tr. 886).[12]

In light of the above, the Court finds the ALJ's determination that there was no new and material evidence demonstrating a worsening of Ogletree's mental impairments is not supported by substantial evidence.

***Opinion Evidence***

Ogletree next argues the ALJ's determination of her RFC "erred in that it excluded or discounted all of the material, consistent and well-supported opinions from her treating physicians."  (Doc. No. 15 at 7.)  Specifically, she maintains the ALJ failed to provide good reasons for his decision to reject the medical opinions of Drs. Tamayo-Reyes and Cheng, as well as the opinions of counselors Mohany and McMillion.  Ogletree argues "the ALJ's brief explanation for rejecting the opinions of the four treating sources does not provide sufficient good reasoning as to why each opinion is inconsistent with clinical techniques."  (*Id.* at 9.)  Additionally, she maintains the ALJ erred "by exaggerating the evidentiary value that these minimal activities of daily living bear on her capacity to maintain full-time employment."  (*Id.*)

The Commissioner argues the ALJ properly discounted the opinions at issue because

---

[12] The Commissioner correctly notes the Sixth Circuit has held that an ALJ is not required to reference GAF scores.  However, it is not appropriate for an ALJ to mischaracterize the record.  Here, the ALJ states that, while compliant with medication, Ogletree's GAF scores "indicated no more than moderate limitations."  (Tr. 249.)  As discussed above, this is not an accurate depiction of the record.

"they were inconsistent with medical evidence showing Plaintiff's mental condition improved with treatment and medication compliance."  (Doc. No. 17 at 11.)  She asserts "Plaintiff's activities further reinforce her improved mental functioning with prescribed treatment."  (*Id*.) Finally, the Commissioner notes the ALJ correctly observed "the opinions of the treating doctors and therapists were inconsistent with certain objective medical findings in the record," including findings of Ogletree's treating physicians that she was in no distress and was alert, oriented, and cooperative.  (*Id*. at 14.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[13]

---

[13] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Here, the record contains multiple opinions regarding Ogletree's mental functioning. As discussed *supra*, Dr. Tamayo-Reyes offered an opinion in March 2013, finding Ogletree to be only "occasionally" or "rarely" able to perform most work-related mental functions.  (Tr. 750-751.)  Dr. Cheng authored an opinion in October 2013, in which he reached a similar finding and

_____

source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

determined Ogletree could occasionally perform five work-related mental functions and rarely perform fourteen such functions.  (Tr. 777-778.)  In March 2014, Dr. Cheng opined Ogletree was somewhat improved and could frequently perform eleven functions, occasionally perform eight functions, and rarely perform three work-related mental functions.  (Tr. 790-791.)

In addition, Ms. Mahoney and Ms. McMillion each offered opinions in September 2012.[14]  (Tr.  496-497, 532-539.)  Ms. Mahoney opined Ogletree's functioning was "poor" in the areas of concentration, judgment, reliability, following simple instructions, and following program rules.  (Tr. 496.)  Ms. McMillion found Ogletree was markedly/extremely impaired in a number of work-related mental functions, including her ability to maintain attention to perform simple repetitive tasks, relate to others, and withstand the stress and pressures associated with day to day work activity.  (Tr. 538.)

In addressing the opinion evidence, the ALJ first accorded "great weight" to the state

---

[14] Ms. Mahoney (a "Qualified Mental Health Specialist") and Ms. McMillion (a licensed social worker) are not "acceptable medical sources" under social security regulations. Rather, social workers and mental health counselors are "other sources" pursuant to 20 C.F.R. § § 404.1513(d) and 416.913(d), which are not subject to the "good reasons" requirement of the treating physician rule.  *See Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011); *Arnett v. Comm'r of Soc. Sec.*, 142 F. Supp.3d 586, 591 (S.D. Ohio 2015). Nonetheless, according to Social Security Ruling ("SSR") No. 06–03p, 2006 WL 2329939 (Aug. 9, 2006), an ALJ must still consider opinions and findings from "other sources" and "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.  *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007); *Arnett*, 142 F. Supp.3d at 591. Indeed, "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file."  SSR 06-03p, 2006 WL 2329939 at * 3.

agency psychologists who reviewed Ogletree's records and found "no new and material evidence

that would justify a change in the conclusions of the prior Administrative Law Judge decision."

(Tr. 250.)  The ALJ the addressed the opinions of Dr. Tamayo-Reyes, Dr. Cheng, Ms. Mahoney

and Ms. McMillion in one paragraph, as follows:

> The undersigned has read and considered the various medical opinions submitted
> by Camone Mohaney [sic], CPST, Lindsey McMillion, LSW, Anna Lynn Tamayo
> Reyes, M.D., and Pu Cheng, M.D., regarding the claimant's mental condition
> (Exhs. B3F, B4F, B6F, B16F, B20F, B22F, B23F, B25F).  In this case, all of the
> aforementioned opinions indicate overall the claimant's mental impairments
> cause extreme limitations and indicate she could rarely understand, remember,
> and carryout detailed job instructions and rarely make personal, social, and
> occupational adjustments.  However, as discussed above, the record shows the
> claimant's mental health symptoms improve with medication and treatment
> compliance.  In fact, the record shows the claimant was able to go to school,
> spend time with her grandchildren, work in a café in some capacity, and get
> married.  (Exhs. B5F, B27F.)  This indicates the claimant is able to interact with
> others, maintain relationships, follow instructions, and learn a job.  Furthermore,
> despite the claimant's alleged symptoms, during office visits for treatment of her
> physical conditions, medical professionals consistently found the claimant in no
> distress, alert, cooperative, and oriented to all spheres, all of which are
> inconsistent with debilitating mental health impairments.  (Exhs. B9F, p. 14;
> B15F, p. 5; B24F, p. 2; B26F, pp. 25-26).  In this case, nothing in the record
> supports the aforementioned opinions or justifies, for that matter, a change in the
> mental residual functional capacity defined in the prior Administrative Law Judge
> decision (Exh. B1A).

(Tr. 250.)

For the following reasons, the Court finds the ALJ failed to provide "good reasons" for

rejecting the opinions of Drs. Tamayo-Reyes and Cheng.  As an initial matter, it is undisputed

that both Dr. Tamayo-Reyes and Dr. Cheng constitute treating physicians.  The record reflects

Ogletree presented to Dr. Tamayo-Reyes on nine occasions between August 2012 and March

2013, when Dr. Tamayo-Reyes provided her opinion regarding Ogletree's mental functioning.

Ogletree had presented to Dr. Cheng on three occasions when he authored his October 2013

42

opinion, and a total of six times when he provided his second opinion in March 2014.  Because

both Drs. Tamayo-Reyes and Cheng constituted treating psychiatrists, the ALJ was required to

articulate "good reasons" for not affording their respective opinions controlling weight.[15]

       The primary reason provided by the ALJ for rejecting the opinions of Drs. Tamayo-

Reyes and Dr. Cheng is that "the record shows the claimant's mental health symptoms improve

with medication and treatment compliance."  (Tr. 250.)  As set forth at length *supra*, however,

the ALJ's determination that Ogletree's symptoms improved with treatment is not supported by

substantial evidence.  Rather, a careful review of the record demonstrates that, even with

medication and counseling, Ogletree continued to report severe psychotic symptoms including

paranoid delusions and auditory, visual, and/or tactile hallucinations.  (Tr. 504-506, 535, 552,

686, 718-721, 951, 912.)  Moreover, mental status examination consistently noted "somewhat

disorganized thought process," "prominent delusion of persecution," "active and ongoing

auditory hallucinations," and impaired or severely impaired insight and judgment.  (Tr. 896-897,

906-907, 913-914, 720, 689.)  In light of the above, the Court rejects this reason for discounting

the opinions of Drs. Tamayo-Reyes and Cheng as unsupported by substantial evidence.

       The Court also rejects the ALJ's suggestion that Ogletree's ability to spend time with

her grandchildren, attend GED classes, work in a café "in some capacity," and get married

indicates she is able to maintain full-time employment.  As an initial matter, Ogletree reported

she worked in a café for no more than three hours per week and was placed there through her

---

[15] The ALJ did not expressly state how much weight he accorded the opinions of Dr.
Tamayo-Reyes or Dr. Cheng nor did he attempt to distinguish their respective opinions.
However, given the significant mental limitations assessed by these physicians, it appears
to the Court that the ALJ implicitly rejected the majority of the opinions assessed by
these sources.  The Commissioner does not argue otherwise.

mental health provider's vocational program and with the help of a job coach.  (Tr. 276-277.)

Additionally, she reported difficulty attending her GED classes due to her fear of crowds, and it

is not clear she was ever able to attain a degree.  (Tr. 694, 944.)  Ogletree also testified she

separated from her husband, apparently after only four months of marriage.[16]  (Tr. 264.)  In any

event, the fact Ogletree may be able to engage in some or all of these activities does not indicate

she is able to perform full-time work activities on a sustained basis.  *See Lorman v. Comm'r of*

*Soc. Sec*, 107 F. Supp.3d 829, 838 (S.D. Ohio 2015) (stating that "Plaintiff's ability to perform

some activities on a limited basis is not substantial evidence that her symptoms are not

disabling").  *See also Rogers v. Comm'r of Soc. Sec*, 486 F.3d 234, 248 (6th Cir. 2007) (finding

that the claimant's ability to perform "somewhat minimal daily functions [is] not comparable to

typical work activities.");  *Lowe v. Comm'r of Soc. Sec*., 2014 WL 4707804 at * 7 (S.D. Ohio

Sept. 22, 2014).  Nor does the Court believe that the fact Ogletree was described as "alert and

oriented" during treatment for her physical conditions provide sufficient basis for the wholesale

rejection of the opinions of her treating psychiatrists.

      Accordingly, the Court finds the ALJ's reasons for rejecting the March 2013 opinion of

Dr. Tamayo-Reyes, and the October 2013 and March 2014 opinions of Dr. Cheng, are not

supported by substantial evidence.  Thus, the Court recommends a remand is necessary, thereby

affording the ALJ the opportunity to sufficiently address the mental functional limitations

---

[16]  In August 2013, Ogletree reported to her counselor that she had just gotten married.
(Tr. 926.)  At the hearing in June 2014, she testified that she separated from her husband
eight months previously, i.e., in November 2013.  (Tr. 264.) Thus, it appears Ogletree
and her husband separated after four months of marriage.

assessed by Dr. Tamayo-Reyes and Dr. Cheng.[17]  On remand, the ALJ should also separately consider and address the opinions of Ms. Mahoney and Ms. McMillion.

### Step Three Finding

Finally, Ogletree argues the ALJ erred by failing to assess whether she met or medically equaled Listing 12.03, which pertains to schizophrenia, paranoid, and other psychotic disorders. (Doc. No. 15 at 12.)  She notes the ALJ did assess disability under Listings 12.04 and 12.08, which share the same "Paragraph B" criteria as Listing 12.03.  (*Id*. at 12-13.)  Ogletree asserts the ALJ erred in finding she did not satisfy the Paragraph B criteria, i.e., that she is only moderately limited in activities of daily living, social functioning, and concentration, persistence, and pace.  (*Id*. at 13.)  Specifically, she maintains "the record as a whole evidences [her] struggles in all these functional [areas] because of her paranoia, delusions, anti-social behavior, and active visual and auditory hallucinations."  (*Id*. at 15.)  Ogletree asserts she meets the "Paragraph B" criteria of Listing 12.03 and, therefore, the Court should reverse the ALJ decision and issue a finding of disability.

The Court need not reach this issue.  The ALJ's step three analysis may change in light of the Court's finding that the ALJ misapplied *Drummond* and failed to properly weigh the treating physician opinions in this case.  Accordingly, the Court declines to address this issue at

---

[17] The Court is not suggesting the ALJ is required to accord "controlling weight" to some of even any of these opinions.  Indeed, the Court notes that Dr. Cheng's March 2014 opinion contains several puzzling inconsistencies, including that Ogletree can frequently understand, remember, and carry out complex job instructions but only rarely understand, remember, and carry out simple job instructions.  (Tr. 791.)  Nonetheless, the ALJ herein did not provide this as a reason for rejecting Dr. Cheng's March 2014 opinion and the reasons he did provide for rejecting the opinions of Dr. Tamayo-Reyes and Dr. Cheng are not supported by substantial evidence.  Accordingly, a remand is required for the ALJ to sufficiently address these opinions.

this time and, instead, directs the ALJ to reevaluate whether Ogletree's impairments met or medically equaled a Listing in light of his reconsideration of the evidence on remand.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this decision.

_/s Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date:   October 6, 2016

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  _See United States v. Walters_, 638 F.2d 947 (6th Cir. 1981); _Thomas v. Arn_, 474 U.S. 140 (1985), _reh'g denied_, 474 U.S. 1111 (1986).**